# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

ANDRE WATSON,
          Appellant,

      v.

DEPARTMENT OF THE TREASURY,
          Agency.

DOCKET NUMBER
CH-0752-20-0450-I-2

DATE: August 15, 2023

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Samuel Hayward</u>, Esquire, Louisville, Kentucky, for the appellant.

<u>John F. Schorn</u>, Washington, D.C., for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

### FINAL ORDER

¶1       The agency has filed a petition for review of the initial decision, which reversed the appellant's removal. For the reasons discussed below, we GRANT the agency's petition for review, VACATE the administrative judge's findings concerning the charges, and SUSTAIN the appellant's removal. We AFFIRM the

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

administrative judge's findings that the appellant failed to prove his affirmative defenses of discrimination and retaliation or that the agency violated his due process rights.

## BACKGROUND

¶2        The appellant was formerly employed by the agency as a Police Officer with the U.S. Mint.  *Watson v. Department of the Treasury*, MSPB Docket No. CH-0752-20-0450-I-1, Initial Appeal File (IAF), Tab 1 at 1.  Effective June 8, 2020, the agency removed him based on two charges of conduct unbecoming and lack of candor.  *Id.* at 16-23.  In particular, the agency charged the appellant with participating in a scheme to hire a private investigator to investigate the private lives of two agency officials and providing false statements to the agency's Office of Inspector General (OIG) during OIG's investigation of the scheme.  *Id.*

¶3        The appellant has consistently denied that he participated in hiring the investigator.  According to the agency's witnesses, however, Officer C.F. approached the appellant about hiring a private investigator to surveil the agency's second in command, Inspector K.P., and a supervisory officer, Sergeant A.B.  IAF, Tab 6 at 51.  Officer C.F. wanted to hire the investigator because she believed that Inspector K.P. and Sergeant A.B. had a relationship outside of work, such that Inspector K.P. favored Sergeant A.B. and did not properly address a work dispute between Officer C.F. and Sergeant A.B.  *Watson v. Department of the Treasury*, MSPB Docket No. CH-0752-20-0450-I-2, Appeal File (I-2 AF), Hearing Transcript (HT) at 95-96 (testimony of Officer C.F.); IAF, Tab 6 at 40-45.  Officer C.F. approached the appellant about hiring the private investigator because the appellant was upset that Inspector K.P. and others had ranked him among the lowest for a promotion to lieutenant.  IAF, Tab 6 at 50-51.  The appellant had previously filed an equal employment opportunity (EEO) complaint against Inspector K.P. and expressed to Officer C.F. and another

coworker, Sergeant J.F., that he felt that Inspector K.P. should have recused herself from his interview for the lieutenant promotion process. HT at 95 (testimony of Officer C.F.); HT at 61-63 (testimony of Sergeant J.F.). According to Sergeant J.F., the appellant expressed that he wanted to hire an investigator or someone to look into the hiring panel because he was so upset. HT at 63.

¶4      In the fall of 2019, the appellant and Officer C.F. had two discussions about hiring a private investigator, which according to Officer C.F. the appellant agreed to go along with and believed was a "good idea." HT at 10-12 (testimony of the appellant); HT at 96 (testimony of Officer C.F.); IAF, Tab 6 at 48. These discussions concerned the reasons for hiring the investigator and how much it would cost. HT at 10-12 (testimony of the appellant). Officer C.F. also sent the appellant an email about a private investigation firm. HT at 105, 112, 139 (testimony of Officer C.F.); IAF, Tab 12 at 23-25. According to Officer C.F., she paid the private investigator $300 via PayPal and the appellant paid her $150 for his portion in cash at work during a post change on the roof of the U.S. Bullion Depository. HT at 93-94 (testimony of Officer C.F.); IAF, Tab 6 at 46, 49. In December 2019, Sergeant J.F. had a conversation with Officer C.F. and the appellant in the police command center during which Officer C.F. showed Sergeant J.F. information on her phone that she had sent or was going to send to the investigator. HT at 97-99 (testimony of Officer C.F.); HT at 64 (testimony of Sergeant J.F.). According to Sergeant J.F., the appellant was present for part of the conversation and he got the impression that the appellant was involved. HT at 79-85, 87. Around that same date, on December 10, 2019, the appellant sent Sergeant J.F. a text message, stating, "The investigator has been hired. If you want to help with this and make it a three way split, then you'll owe $100." IAF, Tab 5 at 45, Tab 6 at 64. The appellant testified that his text message was a joke, as evidenced by Sergeant J.F.'s response in which Sergeant J.F. sent a picture of the actor Peter Falk as the television detective Columbo and joked that the only investigator he would agree to would be Columbo. IAF, Tab 5 at 46; HT at 42

(testimony of the appellant). Sergeant J.F. testified that, although he did not think it was a joke, he responded jokingly because he was not interested in getting involved and that was his way of saying no. HT at 67-68, 79.

¶5 Within days after receiving the appellant's text message, Sergeant J.F. reported to Inspector K.P. that the appellant and Officer C.F. had hired a private investigator to surveil her and Sergeant A.B. HT at 68 (testimony of Sergeant J.F); IAF, Tab 6 at 12, 62. On or about December 18, 2019, the appellant and Officer C.F. were separately called into the Field Chief's office, along with a union representative, J.S. HT at 18 (testimony of the appellant); HT at 102 (testimony of Officer C.F.); HT at 228 (testimony of the union representative). The Field Chief asked each of them separately if they were involved in hiring the private investigator. Officer C.F. admitted that she had hired the private investigator. HT at 100 (testimony of Officer C.F.). The appellant denied any involvement. HT at 18-19 (testimony of the appellant). Thereafter, the matter was referred to the agency's OIG for investigation. IAF, Tab 6 at 11-12. OIG concluded that the appellant participated in hiring the investigator, provided false statements to OIG investigators, and failed to cooperate fully with OIG. *Id.* at 4-8. Following OIG's investigation, the agency proposed and effected the appellant's removal. IAF, Tab 5 at 24-31, 47-53.

¶6 The appellant filed a Board appeal challenging his removal. He raised affirmative defenses of discrimination based on his race and color, retaliation for his prior EEO activity, and a violation of his due process rights. IAF, Tab 1. After holding the appellant's requested hearing, the administrative judge issued an initial decision, finding that the agency failed to prove either of its charges and reversing the appellant's removal. I-2 AF, Tab 20, Initial Decision (ID). In reversing the removal action, the administrative judge found that the appellant's denial that he participated in the scheme to hire a private investigator was more credible than the testimony of two agency witnesses to the contrary. ID at 8-17.

The administrative judge further found that the appellant failed to prove his affirmative defenses.  ID at 18-24.

¶7		The agency has filed a petition for review challenging the administrative judge's credibility findings, and the appellant has filed a response in which he does not address the merits of the agency's petition but rather moves to dismiss the agency's petition based on the agency's failure to comply with its interim relief obligations.  Petition for Review (PFR) File, Tabs 1, 3, 5.[2]

## DISCUSSION OF ARGUMENTS ON REVIEW

The agency has complied with the interim relief order.

¶8		When an administrative judge has ordered interim relief under 5 U.S.C. § 7701(b)(2)(A), an agency must submit a certification with its petition for review that it has either provided interim relief or that it has determined that the appellant's return to, or presence in, the workplace would be unduly disruptive. *Christopher v. Department of the Army*, 107 M.S.P.R. 580, ¶ 5, *aff'd*, 299 F. App'x 964 (Fed. Cir. 2008); 5 C.F.R. § 1201.116(a).  If the agency determines that the appellant's return to the workplace would be unduly disruptive, the agency must nevertheless provide pay, compensation, and all other benefits during the interim relief period.  5 U.S.C. § 7701(b)(2)(B).  The Board's regulations allow an appellant to challenge an agency's certification that it has

---

[2] Neither party has challenged the administrative judge's findings that the appellant failed to prove his affirmative defenses of race and color discrimination, EEO reprisal, or a due process violation, and we discern no reason to disturb these findings.  ID at 18-24.  Regarding the appellant's affirmative defense of discrimination based on race, the administrative judge considered the appellant's comparator evidence and found that Officer C.F., who is Caucasian, was not similarly situated to the appellant because Officer C.F. had no prior discipline.  ID at 23-24.  We construe such a finding as tantamount to a finding that the agency had nondiscriminatory reasons for its differences in discipline.  *See infra* ¶ 27; *see also Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶¶ 27-29 (remanding the appellant's discrimination affirmative defense because the administrative judge improperly found that the alleged comparator was not similarly situated and, thus, did not make a finding as to whether the difference in treatment was the result of discrimination).

provided interim relief, and the Board may dismiss a petition for review if it finds the agency to be in noncompliance with its interim relief obligations. 5 C.F.R. § 1201.116(b), (e).

¶9        The appellant moves to dismiss the agency's petition for failure to comply with the interim relief order in the initial decision. PFR File, Tabs 3, 5. We agree with the appellant that the agency did not include with its petition a certification that it had provided the appellant interim relief effective as of the date of the initial decision. However, we find unavailing the appellant's arguments that the agency has not complied with its interim relief obligations because it did not inform him of the successful completion of a Standard Form (SF) 50 and has not allowed him to return to his duties. PFR File, Tab 5. The agency has submitted evidence demonstrating that, prior to the deadline for filing a petition for review, it notified the appellant that it had determined that his return to duty would cause an undue disruption and executed an SF-52 requesting the appellant's interim appointment in a nonduty paid status, effective September 9, 2021. PFR File, Tab 4 at 8-10. The agency thereafter issued an SF-50 reflecting the appellant's interim appointment. *Id.* at 11. Such evidence is sufficient to establish compliance. *See Salazar v. Department of Transportation*, 60 M.S.P.R. 633, 639 (1994) (stating that, to establish compliance with an interim relief order, all that an agency must accomplish by the petition for review filing deadline is to take appropriate administrative action, such as executing an SF-50 or SF-52 that will result in the issuance of a paycheck for the interim relief period); *see also Christopher*, 107 M.S.P.R. 580, ¶¶ 6, 8 (noting that the Board's authority is restricted to reviewing whether an undue disruption determination was made and whether the appellant is receiving appropriate pay and benefits). To the extent the appellant contends that the agency has not provided him with the "ancillary benefits of employment," PFR File, Tab 5 at 5-6, he has not explained how the pay and benefits he is receiving as reflected in the time and attendance records submitted by the agency, PFR File, Tab 4 at 12-27, are not

consistent with the requirements of 5 U.S.C. § 7701(b)(2)(B). Accordingly, we find that the agency has complied with the interim relief order and the Board exercises its discretion not to dismiss the agency's petition for review.

The administrative judge's credibility findings are contrary to the weight of the evidence and do not reflect the record as a whole.

¶10    To resolve credibility issues, the administrative judge identifies the factual questions in dispute, summarizes the evidence on each disputed question, states which version she believes, and explains in detail why she found the chosen version more credible, considering factors such as the following: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987). Normally, the Board will defer to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). However, the Board may overturn demeanor-based credibility determinations when it has "sufficiently sound" reasons for doing so. *Id.* Sufficiently sound reasons include circumstances when the administrative judge's findings are incomplete, inconsistent with the weight of the evidence, and do not reflect the record as a whole. *Faucher v. Department of the Air Force*, 96 M.S.P.R. 203, ¶ 8 (2004); *see Wallace v. Department of Commerce*, 106 M.S.P.R. 23, ¶¶ 14-16 (2007) (rejecting an administrative judge's credibility determinations for a failure to consider conflicting evidence); *Moore v. Equal Employment Opportunity Commission*, 97 M.S.P.R. 684, ¶ 12 (2004) (rejecting an administrative judge's credibility determination in favor of the testimony of one

agency witness where the testimony conflicted with sworn statements by three impartial witnesses supporting the appellant's account of events).

¶11     Here, we acknowledge that the administrative judge made specific demeanor-based credibility findings. ID at 12, 14, 16. We recognize that the Board would normally defer to such findings and only overturn them under extremely rare circumstances. *See Haebe*, 288 F.3d at 1301. However, as set forth below, we find that the record provides sufficiently sound reasons to overturn the administrative judge's credibility determinations regarding the appellant's participation in the scheme to hire a private investigator. In crediting the appellant's testimony denying his involvement in the scheme, the administrative judge failed to acknowledge that the appellant's version of events is inconsistent with the weight of the evidence, including the testimony of the agency's witnesses, Officer C.F. and Sergeant J.F., the appellant's December 10, 2019 text message to Sergeant J.F., and the transcript of a December 18, 2019 phone call between the appellant and Officer C.F.

> *The administrative judge erred when she failed to consider significant evidence casting doubt on the appellant's credibility.*

¶12     The administrative judge found that the appellant's testimony denying any involvement was more truthful than the testimony of the agency's two witnesses because there was no indication that the appellant had previously lied or had a propensity not to tell the truth. ID at 16. Although we agree with the administrative judge that the appellant consistently denied participating in the scheme, the administrative judge failed to consider or acknowledge the inconsistencies in the appellant's OIG testimony, hearing testimony, and phone call with Officer C.F. regarding his knowledge of and participation in the scheme. ID at 16. In his OIG interview on January 7, 2020, the appellant testified that he had nothing to do with the scheme to hire a private investigator, he only overheard Officer C.F. in the command center talking about hiring an investigator, he thought it was a joke, he did not know why Officer C.F. would

have wanted to hire an investigator, and he could not speak to whether her plan came to fruition. IAF, Tab 6 at 28-29. He further denied paying for the private investigator or that he had any other relevant information such as phone calls or text messages about hiring a private investigator. *Id.* Finally, the appellant stated to the OIG investigators, "I can tell you right now with absolute certainty there's zero evidence on planet Earth to tie me to anything." *Id.* at 29. However, as set forth below, the record reflects that the appellant had direct knowledge regarding the reasons why Officer C.F. wanted to hire the investigator, participated in the plan and knew it had come to fruition, knew the cost of hiring the private investigator and paid Officer C.F. for half of the cost, and attempted to recruit Sergeant J.F. to split the cost three ways.

¶13    On December 18, 2019, the day that both the appellant and Officer C.F. were placed on administrative leave, the appellant, unbeknownst to Officer C.F. recorded their private phone call, which evidences a much greater knowledge and involvement in the scheme than the appellant reported to OIG. IAF, Tab 12; HT at 104 (testimony of Officer C.F.). During the call, rather than expressing confusion as to why he was implicated in a scheme in which he purportedly was not involved, the appellant discussed at length how he was not worried because management could not prove he was involved because there was no phone record of him talking to an investigator and no money exchanging hands between him and an investigator. IAF, Tab 12. Officer C.F. and the appellant discussed who could have reported the scheme, how management found out, how management must have either tapped their emails or recorded what they said in the command center. *Id.* They further discussed what evidence management could have that could tie them to the hiring, and Officer C.F. reminded the appellant that she had sent him an email about hiring a private investigator, which Officer C.F. was going to delete. *Id.*; HT at 105, 112, 139 (testimony of Officer C.F.). Finally, Officer C.F. attempts to apologize to the appellant for getting him involved, but the appellant, who was secretly recording the conversation, cuts her off, stating,

"No, no, no, no, no. Stop. . . . Stop, stop, stop. Nobody's mixed up . . . in anything." IAF, Tab 12 at 19-20. We find that the transcript of this phone call contradicts the appellant's version of events that he was not involved in the scheme to hire a private investigator and that he thought Officer C.F. was joking about hiring an investigator.[3] Moreover, the transcript also corroborates Officer C.F.'s testimony that the scheme was her idea, she felt bad about getting the appellant involved, and she initially hoped to protect the appellant. HT at 101 (testimony of Officer C.F.).

¶14     The appellant's OIG testimony that he did not know why Officer C.F. would want to hire a private investigator and did not know if her plan came to fruition is also inconsistent with his hearing testimony and a December 10, 2019 text message he sent to Sergeant J.F. At the hearing, the appellant testified about two conversations he had with Officer C.F. regarding the specific reasons why she wanted to hire an investigator and how much it was going to cost. HT at 10-12 (testimony of the appellant). Additionally, on December 10, 2019, the appellant sent Sergeant J.F. a text message that stated, "The investigator has been hired. If you want to help with this and make it a three way split, then you'll owe $100." IAF, Tab 6 at 64. The administrative judge credited the appellant's testimony that this text message was a joke because the appellant and Sergeant J.F. had joked via text messages in the past, and Sergeant J.F. responded in a joking manner. ID at 5, 10; IAF, Tab 26 at 8-10.

¶15     However, we cannot reconcile the administrative judge's finding with the record evidence. First, nothing in the appellant's initial message reflects that he

---

[3] The appellant initially submitted a recording of this phone call with his response to the notice of proposed removal, IAF, Tab 5 at 37, 40, and the recording was also played at the hearing. HT at 22. The parties do not dispute the accuracy of the recording or the transcript of this call. IAF, Tab 12; HT at 21, 24-25, 104. The administrative judge deemed the audio recording and transcript admissible after affording the parties an opportunity to brief the issue. IAF, Tabs 13, 15, 20; HT at 25.

was joking and the appellant's December 18, 2019 phone call with Officer C.F. does not support the appellant's theory that his text message was a joke or that he thought Officer C.F.'s plan to hire an investigator was ridiculous. HT at 13 (testimony of the appellant). Second, Sergeant J.F. testified that he did not think the appellant's message was a joke and that his joking response to the appellant was his way of saying he was not interested in participating without saying no.[4] HT at 67-68, 79. Third, the timing of the text message also suggests that the appellant was not joking. Around the same date that the appellant sent the text message, Sergeant J.F. testified that he had a conversation with Officer C.F. and the appellant in the command center during which Officer C.F. showed him information on her phone about hiring a private investigator. HT at 64, 79-85, 87 (testimony of Sergeant J.F.).[5] This included text messages to an investigator, implying the investigator had been hired, and information about the reasons why they thought Inspector K.P. and Sergeant A.B. were involved in some kind of relationship. HT at 64-65 (testimony of Sergeant J.F.). Lastly, and most significantly, Sergeant J.F. plainly did not believe that the appellant was joking because he reported the appellant and Officer C.F.'s scheme to management, which led to the OIG investigation. HT at 68-69; IAF, Tab 6 at 11-12. Thus, we find that the appellant's December 10, 2019 text message to Sergeant J.F. was serious and contradicts the appellant's version of events. We further find the appellant's version of his involvement to be internally inconsistent as well as

---

[4] Although the record reflects that the appellant and Sergeant J.F. had joked via text messages in the past, the context and punctuation of those messages renders it obvious they are jokes. IAF, Tab 26 at 8-9. The administrative judge's finding that Sergeant J.F. denied that he joked with the appellant in past text messages is not accurate. ID at 10. Sergeant J.F. did not deny that he did so but rather testified that it was not a daily or regular occurrence. HT at 76.

[5] Consistent with Sergeant J.F.'s account, Officer C.F. also corroborated that they tried to recruit Sergeant J.F., she showed Sergeant J.F. her message to the investigator, and the appellant messaged Sergeant J.F. about splitting the cost. HT at 140; IAF, Tab 6 at 50.

inconsistent with the record evidence. Moreover, the appellant had a motive to participate in the hiring based on his issues with Inspector K.P., including his prior EEO complaint and his dissatisfaction with the results of the lieutenant exam, for which Inspector K.P. served on the hiring panel. *See supra* ¶ 3. Based on the foregoing, we decline to credit the appellant's testimony.

> *The administrative judge erred in finding Officer C.F.'s testimony was not credible due to prior inconsistent statements.*

¶16     The administrative judge found that Officer C.F.'s testimony was not credible based largely on the fact that Officer C.F. had made inconsistent statements concerning whether the appellant was involved in hiring the private investigator. ID at 12. While under oath at the hearing and during her official OIG interview,[6] Officer C.F. stated that she approached the appellant about hiring a private investigator, she paid the investigator $300 via PayPal, and the appellant paid her $150 in cash at work during a shift change on the roof of the U.S. Bullion Depository. HT at 93-94; IAF, Tab 6 at 37, 45-46. Officer C.F. was also honest and admitted to the Field Chief that she hired the investigator when she was first questioned after Sergeant J.F. reported the scheme to management. HT at 99-100. The Field Chief did not ask her if anyone else was involved. HT at 321 (testimony of the Field Chief). Although Officer C.F. initially made several statements that the appellant was not involved, such statements were made informally and not to management or under oath. First, Officer C.F. initially told her union representative that the appellant was not involved. HT at 117 (testimony of Officer C.F.). Second, on the day she was placed on administrative leave, Officer C.F. overheard on the radio that the appellant was being called into the Field Chief's office and stated to her union representation and another

---

[6] Prior to her OIG interview, Officer C.F. received a *Kalkines* warning notifying her of her obligation to disclose information in her possession during OIG's administrative inquiry and that her failure to answer fully and truthfully could result in discipline, including dismissal. IAF, Tab 6 at 36.

sergeant who was walking her out something to the effect of "why are you calling him, he didn't have anything to do with this." HT at 131 (testimony of Officer C.F.); HT at 230 (testimony of the union representative). Finally, Officer C.F. told the appellant during their December 18, 2019 phone call that she told the Field Chief that the appellant was not involved. IAF, Tab 12 at 12; HT at 120-21 (testimony of Officer C.F.). At the hearing, Officer C.F. testified that her December 18, 2019 statement to the appellant that she told the Field Chief he was not involved was not true and the Field Chief confirmed that he did not ask Officer C.F. who else was involved. HT at 137 (testimony of Officer C.F.); HT at 321 (testimony of the Field Chief).

¶17    Officer C.F. testified that she was initially trying to protect the appellant because the scheme was her idea and she did not want the appellant to be upset with her or for him to get into trouble, particularly because he had already recently been disciplined. HT at 101. However, after meeting with her union representative, who advised her that she would be under oath and needed to tell the truth or she could lose her job, she confirmed the appellant's involvement and thereafter consistently maintained that the appellant was involved. HT at 116-18, 121, 125 137 (testimony of Officer C.F.); HT at 239-40 (testimony of the union representative). We disagree with the administrative judge that this explanation is not credible. It is entirely plausible that Officer C.F. would initially attempt to cover up the appellant's involvement in her plan during informal discussions but admit the truth when faced with an official OIG interview or hearing testimony under oath.

¶18    In declining to credit Officer C.F.'s testimony, the administrative judge failed to consider that her testimony is consistent with Sergeant J.F.'s testimony concerning the appellant's involvement as well as consistent with the rest of the record evidence. Nor did the administrative judge acknowledge that the appellant was similarly not honest with the union representative and did not disclose his December 10, 2019 text message to Sergeant J.F. HT at 244-45 (testimony of the

union representative).    Finally, the administrative judge found without explanation or citation to any evidence that Officer C.F. had a motive to spread the culpability for her plan to the appellant whom she knew was already under investigation.    ID at 14.    Nothing in the record, however, suggests that Officer C.F. made a deal to receive a lesser penalty in exchange for admitting to the appellant's involvement and Officer C.F. denied that she made any deal.  HT at 131.    Officer C.F. received a 30-day suspension based on one charge of conduct unbecoming, which is consistent with the union representative's testimony that, he advised Officer C.F. that, in his experience, management rewards honesty and truthfulness and the penalties are less severe if an employee is honest and owns up to her mistakes.    IAF, Tab 5 at 32-36; HT at 240 (testimony of the union representative).    Based on the foregoing, we find that Officer C.F.'s testimony is credible to the extent it is consistent with the testimony of Sergeant J.F. and supported by the record evidence, including the appellant's December 10, 2019 text message and the December 18, 2019 phone call between the appellant and Officer C.F.  *See Hillen*, 35 M.S.P.R. at 460 (identifying contradiction by or consistency with other evidence as factors to be considered in determining credibility).

> *The administrative judge's credibility findings regarding Sergeant J.F. are not well reasoned.*

¶19    The administrative judge found that Sergeant J.F. had limited capacity to observe whether the appellant was involved in the scheme and characterized his testimony as mere surmise that the appellant was involved based on having seen the appellant and Officer C.F. whispering in the command center.  ID at 8-9. Such a characterization is not an accurate or full description of Sergeant J.F.'s testimony.    Sergeant J.F. testified that he believed the appellant was involved based on his conversation with Officer C.F. and the appellant in the command center in which Officer C.F. showed him information on her phone regarding hiring the private investigator.  HT at 64-65, 79-87.  Such testimony is consistent

with Officer C.F.'s account that she showed Sergeant J.F. information that she was going to or had sent to the investigator and the appellant messaged him about a three-way split. HT at 140. Although we agree that Sergeant J.F.'s testimony is confusing regarding the specific timing of events, we do not find such shortcomings sufficient to render his testimony incredible. Rather, we find more significant that his testimony is generally consistent with Officer C.F.'s account concerning the attempt to recruit him as well as with the rest of the record evidence.

¶20      Additionally, in finding Sergeant J.F.'s testimony not credible, the administrative judge attributed weight to minor inconsistencies and made other findings and inferences the significance of which is not apparent. For example, the administrative judge found significant that Sergeant J.F. could not recall the specific date of his conversation in the police command center.[7]  ID at 8. However, it is not remarkable for a witness not to remember a specific date on which an event occurred over a year later. The administrative judge also found significant that Sergeant J.F. "delayed" notifying Inspector K.P. of the scheme and found improbable Sergeant J.F.'s explanation about why he waited a couple days after he learned of the scheme before reporting it to Inspector K.P. ID at 11. Sergeant J.F. testified that, according to the information he saw on Officer C.F.'s phone, the investigator was not supposed to be hired until the next Wednesday, so that still "gave me some time, a person time to, you know, do whatever she wanted to do with it." HT at 68. Nothing in the record contradicts Sergeant J.F.'s testimony that the investigator had been hired to conduct

---

[7] Contrary to the administrative judge's finding, we do not find significant inconsistencies between the summary of the appellant's OIG testimony and his hearing testimony, particularly given the record contains only a brief summary of his OIG interview, not a complete transcript. ID at 8-9; IAF, Tab 6 at 14. Sergeant J.F. testified that he could not remember the exact dates and that he also told the OIG investigator that he could not recall the exact dates. HT at 78.

surveillance the next Wednesday. HT at 64 (testimony of Sergeant J.F); HT at 99 (testimony of Officer C.F.). Additionally, the administrative judge also found it telling that the appellant mixed up his emotions with that of Inspector K.P. based on his mid-sentence change from a reference to himself (*me*) to a reference to Inspector K.P. (*a person*). ID at 11-12. To the extent the administrative judge found that this demonstrated that Sergeant J.F. needed more time to consider what to do or whether to report the situation, ID at 11-12, we fail to discern how this renders Sergeant J.F.'s testimony not credible. Rather, such a finding is consistent with Sergeant J.F.'s testimony that he took some time to think about the situation, determined that it was not right and Inspector K.P. should be aware of the situation, and he decided to talk to Inspector K.P. the next time he saw her in person. HT at 68.

¶21 Finally, the administrative judge found that Sergeant J.F. may have been motivated by a desire to avoid the appearance of any involvement in the scheme given that when he reported the scheme, he only provided the appellant's initial text message to him about hiring the investigator and not his own joking responses. ID at 9. The administrative judge found that this was significant because Sergeant J.F.'s responses established that the appellant's initial message was a joke. ID at 9-10. However, for the reasons described above, we disagree that the appellant's text message was a joke.

¶22 After thoroughly considering the documentary evidence and the hearing testimony, we credit Sergeant J.F.'s testimony and find that the agency witness's version of events is more likely than the appellant's version of events.

The agency proved its charges.

¶23 A generic charge such as conduct unbecoming does not require specific elements of proof. It is established by proving that the employee committed the acts alleged in support of the broad label. *See Canada v. Department of Homeland Security*, 113 M.S.P.R. 509, ¶ 9 (2010). Essential to the charge, however, is that the conduct was unattractive, unsuitable, or detracted from the

employee's character or reputation. *See Miles v. Department of the Army*, 55 M.S.P.R. 633, 637 (1992). Considering our above analysis, we find that the agency proved by preponderant evidence that the appellant participated in hiring a private investigator to investigate the private lives of two U.S. Mint Protection officials. Moreover, we find such conduct was unsuitable and detracted from the appellant's reputation, particularly given the appellant's position as a Police Officer. Accordingly, we sustain the agency's conduct unbecoming charge.

¶24        Lack of candor is a broad and flexible concept "whose contours and elements depend upon the particular context and conduct involved." *Ludlum v. Department of Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002). Such a charge does not require proof of intent but rather "may involve a failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete." *Id.* Lack of candor "necessarily involves an element of deception." *Fargnoli v. Department of Commerce*, 123 M.S.P.R. 330, ¶ 17 (2016) (quoting *Ludlum*, 278 F.2d at 1284). Here, the agency charged the appellant with providing false statements to OIG investigators and not fully cooperating with an official inquiry. IAF, Tab 1 at 12. As examples, it noted that the appellant falsely denied participating in the hiring of a private investigator and falsely denied communicating verbally or via text message with anyone about hiring a private investigator. *Id.* As described above, the appellant was not forthcoming with OIG concerning his knowledge of and participation in the scheme to hire the investigator. Thus, we find that the agency proved both that the appellant lacked candor regarding his denial that he participated in the hiring of the investigator and by denying that he sent any text messages regarding hiring an investigator. Accordingly, we sustain the agency's lack of candor charge.

There is a nexus between the misconduct and the efficiency of the service.

¶25        Because the administrative judge found that the agency failed to prove the charge and reversed the appellant's removal, she did not make findings as to whether there is a sufficient nexus between the appellant's misconduct and the

efficiency of the service, nor did she determine whether removal is a reasonable penalty. We address those issues now. It is well settled that there is a sufficient nexus between an employee's misconduct and the efficiency of the service when, as in this case, the conduct occurred at work. *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed. Cir. 1987); *Miles v. Department of the Navy*, 102 M.S.P.R. 316, ¶ 11 (2006). Further, the Board has found sufficient nexus between an employee's misconduct and the efficiency of the service when the sustained misconduct concerned an employee's lack of candor during an administrative inquiry. *See Ludlum v. Department of Justice*, 87 M.S.P.R. 56, ¶ 28 (2000) (stating that the appellant's lack of candor strikes at the very heart of the employer-employee relationship), *aff'd*, 278 F.3d 1280 (Fed. Cir. 2002). Therefore, we find that the agency established nexus.

The penalty of removal is reasonable.

¶26    When, as here, all the agency's charges are sustained, the Board will review the agency-imposed penalty only to determine if the agency considered all the relevant factors and exercised management discretion within the tolerable limits of reasonableness. *Pinegar v. Federal Election Commission*, 105 M.S.P.R. 677, ¶ 53 (2007); *see Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981) (articulating a nonexhaustive list of 12 factors that are relevant in assessing the appropriate penalty for an act of misconduct). In making this determination, the Board must give due deference to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility but to ensure that managerial judgment has been properly exercised. *Pinegar*, 105 M.S.P.R. 677, ¶ 53. The Board will modify or mitigate an agency-imposed penalty only when it finds that the agency failed to weigh the relevant factors or that the penalty clearly exceeds the bounds of reasonableness. *Id*.

¶27    The record reflects that the deciding official considered the relevant factors, including, the nature and seriousness of the offense. *See Singh v. U.S. Postal*

*Service*, 2022 MSPB 15, ¶ 18 (noting that the Board has frequently stated that the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibility, is the most important factor in assessing the reasonableness of the penalty). Regarding this factor, the deciding official considered that the offenses touched on honesty and integrity, which was especially serious because the appellant was a law enforcement officer. IAF, Tab 1 at 20. To that end, he also appropriately held the appellant to a higher standard of conduct. *Id.* at 21; *see, e.g.*, *Reid v. Department of the Navy*, 118 M.S.P.R. 396, ¶ 26 (2012). He also considered that the appellant's record for being less than truthful had potential to render him *Giglio* impaired.[8] HT at 176, 188 (testimony of the deciding official). Significantly, he found the appellant's actions affected the privacy and security of the facility and management officials, which is especially serious at the U.S. Bullion Depository, a classified site that stores precious metal bullion reserves including vast quantities of gold. IAF, Tab 1 at 20; HT at 170, 174-75, 185-86 (testimony of the deciding official). The deciding official also determined that, although the appellant had been employed by the U.S. Mint for approximately 4 years, management had lost confidence in the appellant's ability to perform his assigned duties and noted that the appellant had recently served a 14-day suspension for violation of U.S. Mint policy and conduct unbecoming a Federal officer. *Id.* at 21; HT at 186.

¶28    The appellant also raised a claim of disparate penalty. The consistency of the penalty is simply one of many factors to consider in assessing the reasonableness of the penalty and, although the fact that a comparator employee

---

[8] Under *Giglio v. United States*, 405 U.S. 150 (1972), investigative agencies must turn over to prosecutors any potential impeachment evidence concerning the agents involved in the case. *Solis v. Department of Justice*, 117 M.S.P.R. 458, ¶ 4 n.1 (2012). The prosecutor will then exercise discretion regarding whether the impeachment evidence must be turned over to the defense. *Id.* Such potential impeachment evidence may render an agent's testimony to be of marginal value and place at risk any case that relies on such testimony. *Id.*

received a less severe penalty should be considered in favor of mitigating the penalty, mitigation is not required in all such cases. *Singh*, 2022 MSPB 15, ¶ 18. The relevant inquiry for assessing a claim of disparate penalties when weighing the reasonableness of a penalty is whether the agency knowingly and unjustifiably treated employees who engaged in the same or similar offenses differently. *Id.*, ¶ 14. Although the universe of potential comparators will vary from case to case, it should be limited to those employees whose misconduct and/or other circumstances closely resemble those of the appellant. *Id.*, ¶ 13. In most cases, employees from another work unit or supervisory chain will not be proper comparators. *Id.* We find the appellant's disparate penalty arguments unavailing.

¶29 First, in addressing the appellant's discrimination affirmative defense, the administrative judge considered whether the agency had legitimate reasons for issuing Officer C.F. a less severe penalty for similar misconduct as the appellant. ID at 23-24. We agree with the administrative judge that the agency was justified in treating Officer C.F. differently by issuing her a 30-day suspension. ID at 24. Officer C.F. was honest during her OIG interview and therefore she was only charged with conduct unbecoming and not lack of candor, and her misconduct did not raise any concerns regarding her potential to testify under oath. She also had no prior discipline whereas the appellant had recently served a 14-day suspension, and she had over 17 years of service with the agency compared to the appellant's less than 5 years. IAF, Tab 5 at 32-35.

¶30 Second, the appellant contended that Officer J.S. received a less severe penalty based on charges of failure to follow U.S. Mint police procedures and lack of candor. IAF, Tab 35. The record reflects that Officer J.S. engaged in misconduct when he exercised police authority outside of his jurisdiction by conducting an unauthorized stop of a car for an alleged traffic violation and inaccurately reported the circumstances surrounding the incident. HT at 257-58; IAF, Tab 23 at 71-77. Assuming without deciding that Officer J.S. is a proper comparator, we find that the agency treated him similarly. According to the

deciding official,[9] Officer J.S. was also removed based on charges of conduct unbecoming and lack of candor. HT at 197. Similarly, the union representative testified that the agency removed Officer J.S. but that Officer J.S. appealed his removal to the Board and the parties entered into a settlement agreement, the terms of which possibly included allowing Officer J.S. to retire. HT at 255-58, 266, 276, 279. We find that Officer J.S. received the same penalty as the appellant and the fact that such penalty may have later been modified via a settlement agreement does not show that the agency knowingly and unjustifiably treated the appellant differently. *See Dick v. U.S. Postal Service*, 52 M.S.P.R. 322, 325 (finding that an agency is not required to explain lesser penalties imposed against other employees whose charges were resolved by settlements), *aff'd*, 975 F.2d 869 (Fed. Cir. 1992) (Table).

¶31    Finally, the appellant also asserted that Officer M.W. received a 90-day suspension after he was found guilty of driving under the influence and sentenced to jail time. I-2 AF, Tab 18 at 10. We find that Officer M.W.'s misconduct was not sufficiently similar to the appellant's misconduct to render him a proper comparator.[10] *See Singh*, 2022 MSPB 15, ¶¶ 13, 18 (holding that the Board should not attempt to weigh the relative seriousness of various offenses in order to determine whether two employees who committed different acts of misconduct were treated disparately). Having considered the relevant *Douglas* factors, we find that removal was a reasonable penalty under the circumstances. *See, e.g.*, *Jackson v. Department of the Army*, 99 M.S.P.R. 604, ¶¶ 2, 6, 8 (2005) (finding

---

[9] The same individual served as the deciding official for the appellant's removal as well as for Officer J.S.'s removal.

[10] To the extent the appellant is alleging that a prior Inspector was treated more favorably than him, I-2 AF, Tab 18 at 4; HT at 282, such an individual does not appear to be a proper comparator because he was a high-ranking supervisor who was removed for, among other things, complaints regarding his management style, HT at 283. Regardless, even if he were a proper comparator, the record reflects that, like the appellant, he was also removed. HT at 283 (testimony of the union representative).

that removal of police officers was a reasonable penalty for conspiracy to falsify firearm tests and lack of candor).

## NOTICE OF APPEAL RIGHTS[11]

This Final Order constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

---

[11] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision.  If the action involves a claim of discrimination based on

race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations<br>
Equal Employment Opportunity Commission<br>
P.O. Box 77960<br>
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations<br>
Equal Employment Opportunity Commission<br>
131 M Street, N.E.<br>
Suite 5SW12G<br>
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or

other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[12]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

---

[12] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


FOR THE BOARD:              /s/ for
Jennifer Everling
Acting Clerk of the Board

Washington, D.C.